UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| NATHAN CARON and ADAM COCHRANE, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> KEVIN COPPINGER, in his official capacity as Essex County Sheriff, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> C.A. No. 1:25-cv-11075 |

**CLASS ACTION COMPLAINT**

**INTRODUCTION**

1. Plaintiffs Nathan Caron and Adam Cochrane bring this class action under 42 U.S.C. § 1983 to challenge the systematic refusal of the Essex County Sheriff's Department ("Sheriff's Department" or "ECSD") to provide necessary medical treatment to incarcerated people with Hepatitis C. Plaintiffs and the proposed class have Hepatitis C, a bloodborne viral infection that can lead to liver scarring, liver cancer, other serious medical complications, and death. The standard of care for Hepatitis C treatment is to treat nearly all patients infected with Hepatitis C with direct-acting antiviral ("DAA") medications, which have a 95% cure rate with few side effects. This safe and effective treatment is readily available in the community, yet almost no one with Hepatitis C in ECSD custody receives DAA treatment. Through its policies and practices, the Sheriff's Department routinely withholds a universally recommended treatment for a disease that is disproportionately both prevalent and deadly in incarcerated populations, letting the disease inflict grave harm on infected people in Essex jails.

2.      By denying and delaying necessary and potentially lifesaving treatment to Plaintiffs and the proposed class of people with serious medical needs, Defendant Coppinger has acted and continues to act objectively unreasonably and with deliberate indifference that places those in his custody at substantial and unnecessary risk of severe harm. Plaintiffs seek a declaration that Defendant Coppinger's policies and practices with regard to Hepatitis C violate the Eighth and Fourteenth Amendments to the United States Constitution, and a permanent injunction requiring Defendant to implement and adhere to a constitutional treatment protocol for Hepatitis C.

## JURISDICTION AND VENUE

3.      Plaintiffs bring this action under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution.

4.      Jurisdiction is proper under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3). Venue is proper under 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## PARTIES

5.      Plaintiff Nathan Caron is 33 years old and currently incarcerated at the Essex County Correctional Facility in Middleton, Massachusetts ("Middleton House of Correction"), a correctional facility operated by the Sheriff's Department. Mr. Caron has Hepatitis C and is being denied treatment as a result of Defendant's policies and practices.

6.      Plaintiff Adam Cochrane is 36 years old and is incarcerated at Middleton House of Correction. He has Hepatitis C and is being denied treatment as a result of Defendant's policies and practices.

7.      Defendant Kevin Coppinger is the Essex County Sheriff and is sued in his official capacity. Sheriff Coppinger is responsible for the care and custody of people incarcerated in Essex

County correctional facilities, G.L. c. 126, § 16; G.L. c. 127 § 16. He has a non-delegable constitutional obligation to provide adequate medical care to all those in ECSD custody. On behalf of the ECSD, Sheriff Coppinger contracted Wellpath LLC, a private, for-profit corporation, to provide medical services to all people incarcerated at ECSD facilities. Under the contract, Sheriff Coppinger delegated final authority to make create and implement all health care policies and practices in ECSD facilities. Those policies and practices are thereby the policies and procedures of the Essex County Sheriff Department, for which Sheriff Coppinger is liable. *See, e.g., Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1159-60 (M.D. Ala. 2016)(prison officials sued in their official capacities are liable for unconstitutional policies and practices of health care contractor because "when a defendant has a constitutional obligation to provide health care but gives a contractor the responsibility to make final decisions regarding a policy or practice as to when or what care is provided, then their acts, policies and customs become official policy" of the defendant)(quote cleaned up)(citing cases). At all relevant times, Defendant Coppinger has acted and will continue to act under color of state law.

### FACTS

**A.    Hepatitis C is a serious and potentially life-threatening disease**

8.    Hepatitis C is a liver infection that occurs when the Hepatitis C virus ("HCV") attacks and damages liver cells, causing inflammation and scarring (fibrosis). This scarring reduces the liver's ability to filter blood, produce essential enzymes, and carry out its metabolic and detoxification functions.

9.    Hepatitis C is transmitted primarily through contact with blood and is commonly spread through the sharing of needles for injection drugs, sexual activity that leads to exposure to

blood, blood transfusions, and shared use of personal equipment that comes into contact with blood, such as razors.

10. Hepatitis C infections can be either acute or chronic in nature. Acute Hepatitis C occurs within the first six months of exposure to HCV and is usually asymptomatic. While some individuals can "clear" acute HCV on their own, approximately 80% of acute infections lead to chronic Hepatitis C.

11. Chronic Hepatitis C is a long-term illness that develops when the body is unable to fight off the virus on its own. Left untreated, Hepatitis C infections can be lifelong and progressively degrade the liver, causing serious health problems including liver failure, fibrosis (any degree of liver scarring), cirrhosis (more widespread, severe, and likely permanent liver scarring), liver cancer, and death. Hepatitis C infections also increase susceptibility to other illnesses, such as neurological disorders, chronic kidney disease, depression, and extrahepatic cancer (cancer outside the liver).

12. In addition to hepatic symptoms (those impacting the liver), people with Hepatitis C often suffer extrahepatic symptoms (those impacting other organ systems), including Type 2 diabetes, cardiovascular disease, autoimmune disease, severe fatigue, renal diseases, joint pain, impaired cognitive function, jaundice, itching, swelling, and increased likelihood of bruising. Individuals who develop advanced liver disease must undergo cancer screening at regular intervals for the rest of their lives, even after clearing their infection. People with Hepatitis C who do not develop liver-related complications can still suffer from serious extrahepatic manifestations.

13. Delays in Hepatitis C treatment are likely to result in permanent damage to the liver. Between 20% and 30% of individuals with chronic Hepatitis C will progress to cirrhosis in the absence of DAA treatment. Forgoing treatment also increases the likelihood of liver failure,

diabetes, portal hypertension, the need for liver transplantation, and the continued risk of transmission to others.

14. It is currently impossible to predict how quickly liver fibrosis will occur in any given patient. However, research indicates that individuals may develop cirrhosis in as few as five years after infection, especially if certain risk factors (infection after age 40, being male, alcohol consumption, cannabis use, or co-infection with HIV, diabetes, or other metabolic conditions) are present. Many of these risks and comorbidities are prevalent in the correctional population, making it more likely that individuals in jails and prisons will experience rapid liver decline if their illness goes untreated.

15. The rate of Hepatitis C infection in correctional facilities is substantially higher than in the general population, with some studies showing incidence to be as high as one third of any given institution or 20 times the national rate. Prevalence of Hepatitis C in these settings is often much higher than reported, given the lack of comprehensive testing in jails and prisons and limited surveillance data. Individuals entering jails and prisons are more likely to have risk factors contributing to higher rates of Hepatitis C, including a history of injection drug use and limited access to medical care.

**B.     Hepatitis C can be effectively cured**

16. Before 2011, the standard treatment for Hepatitis C was a combination of interferon and ribavirin, which had a cure rate of only about 50%. Interferon-based treatment required a long treatment duration (48 weeks) and resulted in significant side effects, including autoimmune disorders, severe anemia, and flu-like symptoms.

17. In 2011, the FDA approved the first generation of new direct-acting antiviral drugs ("DAAs") that improved results for many patients but still required a long treatment duration and caused harmful side effects.

18. In 2013, Hepatitis C treatment was revolutionized when the FDA began approving a new group of DAAs—including those that are most used today—that have minimal side effects, a shortened treatment duration (of eight to twelve weeks), and a cure rate of 95% or higher. This DAA treatment results in similarly high cure rates in the incarcerated population.

19. Research indicates that even patients who do not complete a full course of DAAs clear the disease at high rates. A study on Hepatitis C patients in the New York City jail population found a 78% cure rate for individuals who were released before completing a full round of DAA treatment.

20. Treatment with DAAs is safe and widely available. It has few contraindications and is easily administered by means of daily pills.

**C.     DAA treatment is the standard of care for nearly all those with Hepatitis C**

21. The medical standard of care for HCV screening and management follows the Hepatitis C Guidance established and updated by the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Diseases Society of America ("IDSA"). These clinical guidelines are recognized as the standard of care by national public health organizations and government agencies, including the Centers for Disease Control and Prevention ("CDC"), the Centers for Medicare and Medicaid Services ("CMS"), and the U.S. Department of Veterans Affairs ("VA"). The World Health Organization also relies on these guidelines.

22. The most recent AASLD/IDSA Guidance, released in December 2023, establishes a "test all, treat all" approach to Hepatitis C. This entails universal testing and unrestricted

treatment. "Universal testing" means one-time, routine, opt-out HCV testing for all adults, with more regular periodic testing for people with high-risk activities, exposures, or conditions, including "persons who were ever incarcerated." "Unrestricted treatment" means DAA treatment for everyone with acute or chronic HCV, unless the patient is going to die soon irrespective of receiving treatment.

23. The Guidance categorically rejects treatment selection or prioritization based on disease stage. There is no medical justification for delaying DAA treatment by requiring further testing once it has been confirmed that the patient has an active HCV infection.

24. Although laboratory tests can help providers understand a Hepatitis C patient's disease progression, lab results such as fibrosis scores may not account for the full picture of someone's disease, and its severity may not be reflected in laboratory work alone.

25. The AASLD/IDSA Guidance states that neither of two common fibrosis measures, the APRI and FIB-4 tests, "is sensitive enough to rule out substantial fibrosis." The Guidance warns against delaying treatment by subjecting patients to repeated bouts of disease-stage testing. The Guidance notes that "strong and accumulating evidence argue against [treatment] deferral because of all-cause morbidity and mortality, prevention of onward transmission, and quality-of-life improvements for patients treated regardless of baseline fibrosis. Additionally, successful HCV treatment may improve or prevent extrahepatic complications [. . .] which are not tied to fibrosis stage. Deferral practices based on fibrosis stage alone are inadequate and shortsighted." The Guidance clarifies that fibrosis may not progress linearly, and even slow progression for many years may be followed by accelerated progression. Accordingly, the Guidance advises prompt treatment for nearly all people with an active case of Hepatitis C.

26. Massachusetts has identified the eradication of Hepatitis C as a public health priority and explicitly recommends DAA treatment for all those in custody.

27. MassHealth has designated DAAs as "medically necessary" for the treatment of Hepatitis C. Since August 2016, all MassHealth subscribers with Hepatitis C have a right to DAAs without restrictions that may previously have been used to limit access to treatment, such as fibrosis score, substance-use abstinence, or provider specialty.

28. The AASLD/IDSA Guidance emphasizes the necessity and feasibility of "opt-out" HCV testing in jails, in which all incarcerated people receive HCV-antibody testing upon admission, followed, if positive, by confirmatory HCV-RNA testing to detect an active infection. The U.S. Preventative Services Task Force and the World Health Organization also recommend that all incarcerated people be tested for Hepatitis C.

**D.     Defendant's policy and practice of denying treatment for Hepatitis C**

29. The Sheriff's Department operates three correctional facilities: the Middleton House of Correction, Essex County Pre-Release & Re-Entry Center, and the Women in Transition Facility. The House of Correction and Women in Transition Facility incarcerate both people awaiting trial and people serving sentences. The Pre-Release and Re-Entry Center incarcerates people serving sentences.

30. The Sheriff's Department contracts with a private vendor, Wellpath, to provide medical care to people in custody at all three facilities.

31. Under the contract, Wellpath has sole and final decision-making authority for all medical care provided to prisoners, including the development and implementation of all policies, practices, procedures, and treatment decisions concerning the delivery of health services to prisoners in ECSD custody.

32. By virtue of this delegated authority, Wellpath's policies, practices, procedures, and treatment decisions concerning the delivery of health services to ECSD prisoners are, in effect and by law, the policies, practices, procedures, and treatment decisions of the Essex County Sheriff's Department. *See Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1159-60 (M.D. Ala. 2016); *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012)("[T]he private company's policy becomes that of the County if the County delegates final decision-making authority to it."); *see also Estate of Angelo v. Bd. of Cnty. Commissioners of Jefferson Cnty.*, No. 1:23-CV-01607-CNS-STV, 2024 WL 2274080, at *20 (D. Colo. May 20, 2024) ("Alleging that Jefferson County contracted with Wellpath to provide medical care at the [jail] is sufficient to establish that Jefferson County may be held liable for Wellpath's policies and customs relating to this provision of medical care.").

33. Wellpath is aware of the standard of care for treatment of Hepatitis C but chooses to disregard it. Wellpath's "Control and Treatment of Hepatitis C" policy states that Wellpath will provide "treatment consistent with current Centers for Disease Control and Prevention (CDC)" guidelines. The CDC guidelines, which follow the AASLD/IDSA Guidance, state that "[c]urative DAA treatment is recommended for essentially everyone with Hepatitis C." Wellpath ignores these guidelines, which reflects the well-established standard of care.

34. Wellpath's Hepatitis C policy states that "[i]nitial treatment [of HCV] consists of self-care." "Self-care" is not medical treatment. There is no medical justification for ordering "self-care" before, or instead of, providing treatment with DAAs.

35. Contrary to the standard of care, Wellpath imposes additional criteria for receipt of DAA treatment beyond merely having an active Hepatitis C infection.

36. Wellpath has a policy and practice of denying approval of DAA treatment to people with HCV in Sheriff's Department custody without medical justification.

9

37. On information and belief, Wellpath approves DAA treatment only for a few categories of people: those who are already on DAA treatment at the time they enter Sheriff's Department custody, those who have documented cirrhosis, and those who have both Hepatitis C and human immunodeficiency virus (HIV). The vast majority of people with Hepatitis C in ECSD custody do not fall into any of these categories and therefore are not approved for DAA treatment.

38. Wellpath has a policy and practice of denying approval of DAA treatment to people with HCV in Sheriff's Department custody for non-medical reasons.

39. Wellpath staff have told Class Members that they will not receive treatment because of the cost of DAA treatment.

40. On information and belief, Wellpath has a policy or practice of denying DAA treatment to anyone being held pre-trial. As a result of this policy or practice, even people awaiting trial for several years have been denied treatment.

41. On information and belief, Wellpath has a policy or practice of denying DAA treatment to anyone who is not guaranteed to complete their sentence before the DAA treatment is completed.

42. Wellpath recommended "diet and lifestyle modifications" rather than DAA treatment to an individual suffering from liver fibrosis due to Hepatitis C. Like "self-care," such measures are not medical treatment, and there is no medical justification for ordering these modifications instead of DAAs. On information and belief, Wellpath regularly recommends "diet and lifestyle modifications" or similarly ineffectual actions instead of treatment.

43. Wellpath has a policy or practice of ordering unnecessary laboratory testing and monitoring instead of approving DAA treatment. This policy and practice dangerously and unjustifiably delays and in many cases effectively denies treatment for those with Hepatitis C.

44. Among other tests, Wellpath uses the FIB-4 (Fibrosis-4) and APRI (AST to Platelet Ratio Index) scoring criteria to evaluate those in its custody for Hepatitis C disease stage. Wellpath denies treatment to people on the basis of these scores. This is contrary to the standard of care, which is to treat everyone regardless of fibrosis score.

45. Wellpath medical providers have a practice of intentionally minimizing the severity of Hepatitis C infection by telling patients that their infection has not progressed based on tests that cannot reliably detect progression, and even though alternate metrics may show progression.

46. Wellpath does not offer opt-out testing for Hepatitis C to people entering its custody. Many incarcerated individuals with Hepatitis C do not know or suspect they have the disease, and therefore do not request testing. Others request testing and do not receive it. The effect of Wellpath's failure to provide opt-out testing is that many people with Hepatitis C in ECSD custody go undiagnosed and untreated. On information and belief, this is the Sheriff's Department's purpose for not providing opt-out testing.

47. Sheriff's Department data show that from January 2021 through January 2025, the number of people with Hepatitis C in Sheriff's Department custody at a given time ranged between approximately 60 and 130 cases. Because the Sheriff's Department does not offer opt-out testing and tests only a small percentage of the people entering its custody for Hepatitis C, the number of people in custody confirmed positive for Hepatitis C is lower than the actual number of people with the virus.

48. Fewer than ten people begin Hepatitis C treatment in Sheriff's Department custody each year.

49. Defendant Coppinger is aware that Wellpath has a policy and practice of providing DAA treatment to only a small fraction of the individuals in his custody who have HCV.

11

### E. Named Plaintiffs

**Nathan Caron**

50. Mr. Caron was diagnosed with Hepatitis C before his incarceration in early 2024.

51. On March 20, 2024, medical staff recorded that he "believes he may have hep c."

52. Labs collected on April 4, 2024, confirmed that Mr. Caron has an active Hepatitis C infection. The labs also strongly suggested that Mr. Caron was suffering from advanced liver fibrosis and cell death (necroinflammatory activity), such that DAA treatment was indisputably indicated over a year ago.

53. At around this time, a nurse told him that his Hepatitis C was "really bad, almost at the stage of cirrhosis."

54. Although the nurse sought treatment for Mr. Caron at this stage, Mr. Caron was told that the nurse was "blocked." Rather than providing treatment, Wellpath sent Mr. Caron for additional bloodwork and enzyme testing, as well as an ultrasound. There was no medical justification to delay treatment to obtain this testing, or to condition his treatment with DAAs on the results of the testing.

55. The same nurse tried to get Mr. Caron treatment in January 2025 but was again "blocked."

56. Mr. Caron's labs on February 4, 2025, again suggested that he has advanced liver fibrosis and possibly cirrhosis. Instead of immediate treatment for this life-threatening condition, medical staff characterized his disease stage as "fair" and merely scheduled him for another liver ultrasound and a follow-up 90 days later.

57. Mr. Caron has repeatedly requested treatment for his Hepatitis C while in ECSD custody without success. There is no medical justification for denying him treatment with DAAs.

58. Under Defendant's Hepatitis C policy and practice, Mr. Caron has been denied treatment for this serious medical need, causing his condition to deteriorate and placing him at a substantial risk of further complications or death.

59. Mr. Caron has encountered many other people in ECSD custody with Hepatitis C who are similarly unable to get treatment from the jail for their disease.

**Adam Cochrane**

60. Adam Cochrane believes he has had Hepatitis C for at least 9 years and has had symptoms such as fatigue, watery eyes, and appetite changes for most of that time.

61. Adam Cochrane has been incarcerated at Middleton House of Correction multiple times in the past several years. He has repeatedly asked for Hepatitis C testing in order to get treatment. His medical records show his active chronic infection was confirmed by the Sheriff's Department in May 2022.

62. When he asked for testing in order to get treatment two years ago and again in the fall of 2024, medical staff told him he could be tested, but he was not.

63. In January of 2025, Mr. Cochrane successfully requested testing from Wellpath. His results confirmed his chronic Hepatitis C diagnosis, and he requested treatment. A nurse practitioner wrote in his file, "Communication sent to the patient regarding his HCV infection. APRI and FIB4 were normal showing no signs of fibrosis or cirrhosis. Detctable *[sic]* HCV RNA-active infection. Recommended treatment in the community."

64. There is no medical justification to delay treating Mr. Cochrane until he is "in the community." Nor is there a medical justification for denying treatment based on his APRI and Fib-4 scores. Mr. Cochrane's Hepatitis C infection is, at present, a serious medical need.

65. Mr. Cochrane's untreated Hepatitis C causes him to suffer physical symptoms including constant fatigue, appetite changes, and feeling unwell every morning when he wakes up. He suffers anxiety that his treatable condition is deteriorating and that he will suffer permanent injury or death if it remains untreated.

66. He has repeatedly told nurses that he is feeling unwell and that he wants treatment for his Hepatitis C. Because of Wellpath's policies and practices, nurses at the jail have repeatedly told him there is nothing they can do. After Mr. Cochrane submitted an appeal of his medical grievance for denial of Hepatitis C treatment, he was called to meet with a Wellpath representative whom he believes was a doctor, who told him that funding for his treatment would not be approved because his "levels aren't that bad" and it "has to be serious" for DAA treatment to be funded at the jail.

67. Plaintiffs Cochrane and Caron have spoken to many others in ECSD custody with Hepatitis C who have had similar experiences. Defendant's policy and practice of denying DAAs is well-known among Class Members, many of whom have given up trying to access treatment while in custody.

68. Wellpath knows that the standard of care requires treatment with DAAs for all individuals with Hepatitis C. Wellpath consciously disregards this standard. Wellpath knows its policy and practice of denying DAA treatment increases the likelihood that Plaintiffs and Class Members will develop serious medical problems. Wellpath is aware of the serious medical problems its denial of DAA treatment has already caused to people in its care. Wellpath knowingly allows these harms to occur.

69. As a result of Defendant's policies and practices, Plaintiffs and Class Members have suffered, will continue to suffer, or will be at a substantial risk of suffering serious health

problems including liver failure, fibrosis, cirrhosis, liver cancer, and death, as well as increased susceptibility to other illnesses including encephalopathy, chronic kidney disease, depression, and extrahepatic cancers.

70. As a result of Defendant's policies and practices, Plaintiffs and Class Members have suffered, will continue to suffer, or will be at a substantial risk of suffering emotional injuries including depression, anxiety, and fear that their condition is deteriorating and that they will suffer permanent injury or death if it remains untreated. Plaintiffs and Class Members suffer additional emotional distress because they know their condition is treatable.

## CLASS ACTION ALLEGATIONS

71. This is a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure.

72. Plaintiffs are representatives of a class composed of all people who are or will be in the custody of the Sheriff's Department who have Hepatitis C.

73. Membership in the class is so numerous that joinder of all members is impracticable. As of early January 2025, the Sheriff's Department reported 88 people in its custody with Hepatitis C, although the actual number is likely higher given the Department's failure to test a large portion of those in its custody.

74. Plaintiffs' claims involve questions of law and fact that are common to the class. Common questions include (1) whether Defendant has a policy or practice of failing to provide DAA treatment to people in his custody with Hepatitis C without medical justification; (2) whether Defendant has a policy or practice that unjustifiably delay treatment for Hepatitis C; (3) whether Defendant has a policy or practice of denying HCV treatment for non-medical reasons such as cost, length of sentence, or whether an individual is being held pretrial; (4) whether Defendant's

failure to provide DAA treatment puts Plaintiffs and members of the class at risk of serious harm; (5) whether Defendant is deliberately indifferent to the serious medical needs of Plaintiffs and members of the class; and (6) whether Defendant's failure to provide treatment for Plaintiffs' and Class Members' serious medical needs is objectively unreasonable.

75. Plaintiffs' claims are typical of the claims of the class because Plaintiffs and all Class Members have been injured by the same wrongful policies and practices of Defendant. Plaintiffs' claims arise from the same practices and conduct that give rise to the claims of Class Members, and are based on the same legal theories.

76. Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs have no interests that conflict with those of the Class.

77. Plaintiffs are represented by competent counsel who will adequately and fairly protect the interests of the class. Counsel has thoroughly investigated Plaintiffs' claims. Counsel is knowledgeable about the constitutional rights of incarcerated people and other applicable law, is experienced in handling class action and other complex litigation on behalf of incarcerated people, and has committed the resources necessary to represent the class.

78. Defendants have acted and refused to act on grounds generally applicable to the class so that final declaratory and injunctive relief would be appropriate to the class as a whole.

## CLAIMS FOR RELIEF

### Count I

**42 U.S.C. § 1983: Right to Adequate Medical Care under the Eighth and Fourteenth Amendments**

79. Plaintiffs restate and reallege the preceding paragraphs of this Complaint as if fully set forth herein.

80. By the policies and practices described above, Defendant is violating the rights of Plaintiffs and the members of the class to be free from cruel and unusual punishment and to due process guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution.

81. Defendant's failure to provide immediate and effective treatment for Hepatitis C to Plaintiffs and the members of the class constitutes deliberate indifference and is objectively unreasonable.

82. As a result of Defendant's violations, Plaintiffs and the members of the class have suffered and will continue to suffer physical and emotional injuries.

## PRAYER FOR RELIEF

83. WHEREFORE, Plaintiffs request that this Court grant them the following relief:

    a. Certify that this action be maintained as a class action of all people who are or will be in the custody of the Sheriff's Department who have Hepatitis C;

    b. Issue a judgment against Defendant under 42 U.S.C. § 1983, declaring that his acts, omissions, policies, and practices regarding the treatment of Hepatitis C are cruel and unusual punishment and objectively unreasonable in violation of the Eighth and Fourteenth Amendments to the United States Constitution;

    c. Issue a permanent injunction ordering Defendant to implement and adhere to a constitutional treatment protocol that includes timely and adequate screening of people in ECSD's custody for Hepatitis C, including universal opt-out testing for Hepatitis C; timely treatment of all people in ECSD's custody with Hepatitis C with medication consistent with the medical standard of care, currently DAAs; elimination of unjustified exclusions from or denials of treatment; and connection to community care upon release for people with Hepatitis C;

d.  Award Plaintiffs' their reasonable attorneys' fees and costs, in accordance with 42 U.S.C. § 1988 and other applicable law; and

e.  Grant such other and further relief as this Court deems just and proper.

Dated: April 23, 2025            Respectfully Submitted,

Plaintiffs NATHAN CARON and
ADAM COCHRANE, on behalf of themselves
and all others similarly situated.

By their attorneys,

/s/ Rachel Talamo
David Milton, BBO # 668908
Michael Horrell, BBO # 690685
Ada Lin, BBO # 710270
Rachel Talamo, BBO # 713707
Prisoners' Legal Services of Massachusetts
50 Federal Street, 4th Fl.
Boston, MA 02110
(617) 482-2773
dmilton@plsma.org
mhorrell@plsma.org
alin@plsma.org
rtalamo@plsma.org